UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RILLITO RIVER LLC dba ECOFASTEN SOLAR, an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>BAMBOO INDUSTRIES LLC dba SOLARHOOK, a Delaware limited liability company,<br><br>Defendant. | No. 2:17-cv-00181-TLN-CKD<br><br>**ORDER RE CLAIM CONSTRUCTION** |

This matter is before the Court on the parties claim construction relating to five United States patents. (Joint Claim Construction Statement, ECF No. 37.) Plaintiff Rillito River LLC dba EcoFasten ("EcoFasten") filed a timely opening brief. (ECF No. 38.) Defendant Bamboo Industries LLC dba SolarHooks ("SolarHooks") opposed EcoFasten's proposed constructions. (ECF No. 39.) The Court held a claim construction hearing on May 14, 2018.

**I.   BACKGROUND**

EcoFasten alleges SolarHooks infringes five patents held by EcoFasten: U.S. Patent Nos. 8,153,700 ("'700 patent"); 9,134,044 ("'044 patent"); 9,447,988 ("'988 patent"); 9,774,292 ("'292 patent"); and 9,793,853 ("'853 patent"). The parties seek construction of claims from only three of the patents: the '044 patent, the '988 patent and the '853 patent. All three of the

aforementioned patents relate generally to the field of "mounting assemblies for supporting solar panels and other structures on roof tops." (the '004 patent at 2:3–4; the '988 patent at 2:16–17; the '853 patent at 2:11–13.) EcoFasten alleges SolarHooks sells multiple products that infringe EcoFasten's patents, including the Composition Flashing Kit, the W Tile Replacement System, the S Tile Replacement System, and the Flat Tile Replacement System.

Exemplary claim 1 from the '044 patent provides:

> A mount assembly for mounting a structure to a roof, the roof including a top surface, the mount assembly comprising:
> a flashing including an aperture;
> a bracket including a first portion and a second portion, the first portion having an opening and a countersink extending around the opening, the second portion extending at an angle away from the flashing, the second portion including a slot configured to be coupled to the structure,
> a fastener extending through the aperture and through the opening of the bracket; and
> a seal extending around the aperture and positioned between the flashing and the first portion of the bracket, the seal engaging the countersink of the bracket and being compressed against the flashing.

(the '044 patent at 45:39−53.)

Exemplary claim 1 from the '988 patent provides:

> A mount assembly for mounting a structure to a roof, the roof including a top surface, the mount assembly comprising:
> a flashing including an aperture;
> a bracket including a first portion and a second portion, the first portion having an opening and a countersink extending around the opening, the second portion extending at an angle away from the flashing, the second portion including a slot configured to be coupled to the structure,
> a fastener extending through the aperture and through the opening of the bracket; and a seal extending around the aperture and engaging the countersink of the bracket.

(the '988 patent at 46:51−63.)

Exemplary claim 1 from the '853 patent provides:

> A roof mounting system comprising:
> flashing defining a first projection and a second projection, wherein the second projection is defined within the first projection, and
> wherein a first aperture is defined through the second

projection;
a bracket positionable on the flashing and configured to contact the first projection and at least partially surround the second projection,
wherein a second aperture is defined in the bracket;
a seal installable on the bracket;
a fastener installable through the seal, the first aperture, and the second aperture, configured to compress the seal, flashing, and bracket against one another.

('853 patent at 32:47–61.)

The parties seek construction of three claim terms: (1) "a block coupled to the base" from the '044 patent and the '988 patent; (2) "countersink extending around the opening" from the '044 patent; and (3) "partially surround" from the '853 patent. The Court held a claim construction hearing on May 14, 2018. The Court gave the parties an opportunity to respond to the Court's questions and clarify points in their briefing papers. The matter was submitted at the conclusion of the hearing.

## II.   STANDARD OF LAW[1]

Claim construction is a matter of law. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Terms contained in claims are "generally given their ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582. In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *see also Vitronics*, 90 F.3d at 1582. "A claim term used in multiple claims should be construed consistently...." *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002).

"The appropriate starting point ... is always with the language of the asserted claim itself." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date

---

[1] The standard of law was taken verbatim from *Gutterglove, Inc. v. American Die and Rollforming, Inc.*, No. 2:16-cv-02408-WHO, 2017 WL 4124229, a *2–3 (E.D. Cal. Sept. 18, 2017).

of the patent application." *Phillips*, 415 F.3d at 1312. "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "Claims speak to those skilled in the art," but "[w]hen the meaning of words in a claim is in dispute, the specification and prosecution history can provide relevant information about the scope and meaning of the claim." *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (citations omitted). "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. "However, claims are not to be interpreted by adding limitations appearing only in the specification." *Id.* "Thus, although the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." *Id.* Conversely, "where [ ] the claim language is unambiguous, [the Federal Circuit has] construed the claims to exclude all disclosed embodiments." *Lucent Techs., Inc. v. Gateway, Inc.,* 525 F.3d 1200, 1215–16 (Fed. Cir. 2008). "[T]he description may act as a sort of dictionary, which explains the invention and may define terms used in the claims," and the "patentee is free to be his own lexicographer," but "any special definition given to a word must be clearly defined in the specification." *Markman*, 517 U.S. at 989–90.

On the other hand, it is a fundamental rule that "claims must be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

Finally, the court may consider the prosecution history of the patent, if in evidence.

4

*Markman*, 52 F.3d at 980. The prosecution history may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582–83); *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotations omitted).

In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. *Vitronics*, 90 F.3d at 1583. "Thus, under Vitronics, it is entirely appropriate ... for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. All extrinsic evidence should be evaluated in light of the intrinsic evidence, *Phillips*, 415 F.3d at 1319, and courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernible from examination of the claims, the written description, and the prosecution history, *Pitney Bowes*, 182 F.3d at 1308 (citing *Vitronics*, 90 F.3d at 1583). While extrinsic evidence may guide the meaning of a claim term, such evidence is less reliable than intrinsic evidence. *Phillips*, 415 F.3d at 1318–19.

### III. DISCUSSION

EcoFasten and SolarHooks disagree as to the construction of three terms: (1) "a block coupled to the base" from the '044 patent and the '988 patent; (2) "countersink extending around the opening" from the '044 patent; and (3) "partially surround" from the '853 patent.[2] The Court will address each term separately below.

---

[2] In its opening brief, EcoFasten construed two additional terms not mentioned by the parties in the joint claim construction statement: (1) "support plate" in the '292 patent; and (2) "the fastener configured to compress" in the '853 patent. (*Compare* ECF No. 38 *with* ECF No. 37.) SolarHooks does not dispute the additional terms. Therefore, the Court will not construe them.

A. "A Block Coupled to the Base"

The term "a block coupled to the base" appears in claims 22, 23, 24, 25, and 30 of the '044 patent and claims 17, 18, and 20 of the '988 patent.[3] The parties seek the same construction for both patents. Thus, the Court will discuss the construction together.

| EcoFasten's proposed construction | SolarHooks' proposed construction | The Court's Construction |
|---|---|---|
| "a standoff or any structure generally having the shape of a rectangular prism or cube connected to the base" | "a standoff separate from the base and directly or indirectly connected or fastened to the base" | "a standoff separate from the based connected or fastened to the base" |

To provide context to the claim term, the relevant portion of claim 22 is as follows:

> A mount assembly mounting a structure to a roof, the roof including a top surface, the mount assembly comprising: a base coupled to the top surface of the roof; *a block coupled to the base and having an upper surface*

('044 patent at 46:58–61.)

EcoFasten contends the term should be construed as "a standoff or any structure generally having the shape of a rectangular prism or cube connected to the base." (ECF No. 37 at 3, 5.) SolarHooks seeks to construe the term as "a standoff separate from the base and directly or indirectly connected or fastened to the base." (ECF No. 37 at 3, 5.) In so construing, SolarHooks contends the block must be separate from the base because when looking at the claim and other similar terms, "coupled to" denotes a connection between two objects. (ECF No. 39 at 15–16.) SolarHooks looks to the patent's intrinsic evidence first before supporting its conclusion with case law. Additionally, SolarHooks argues EcoFasten's definition of "block" is too narrow and should not be construed so limitedly.

>  *i.    The block must be separate from the base.*

SolarHooks asserts the context the term is used in the claim is highly instructive as to its meaning. SolarHooks notes the term "coupled to" is used twice in the given claim and directs the

---
[3] Claim 22 of the '044 patent is an independent claim with the other claims being dependent on claim 22. Similarly, claim 17 of the '988 patent is an independent claim with the other claims being dependent on claim 17.

6

Court to the meaning of the first use of "coupled to". Claim 22 includes a preamble describing "a roof including a top surface." SolarHooks points out claim 22 then uses "coupled to" to denote "a base coupled to the top surface of the roof." SolarHooks contends the preamble and the first instance of "coupled to" are informative. First, SolarHooks explains the syntax of the term "including" denotes subparts of a single whole, i.e. the roof is the whole and the top surface is a subpart of the roof. Second, SolarHooks points out the syntax of "coupled to" in contrast describes two separate yet joined components, i.e. the roof and the base. Following this same syntax analysis, SolarHooks asserts the use of "having" in the claim "a block coupled to the base and having an upper surface" means the upper surface is the subpart of the block and "coupled to" signifies the base and block are separate yet joined. (*See* ECF No. 39 at 15.)

EcoFasten argues SolarHooks construction is actually consistent with EcoFasten's construction. (ECF No. 42 at 6.) EcoFasten asserts SolarHooks concedes that the base and block may be directly fastened suggesting the block and base need not be separate. (ECF No. 42 at 7.) Essentially, EcoFasten takes from the term "directly" the ability for the block and the base to be part of a singular piece and sees SolarHooks use of "directly" as a concession on this point. (ECF No. 42 at 6–7.)

The Court attempted to further elicit EcoFasten's view on the characterization of the term "coupled to" at the claim construction hearing.[4] The Court asked EcoFasten whether given its reading of the term — as not requiring the block and base to be separate — the base also need not be separate from the roof. EcoFasten answered in the affirmative, explaining there is nothing in the specification that prevents the base from being fused to or part of the roof. In response, SolarHooks stated that the mounting component in the patent involves hardware and specification for a base that is anchored to a roof and there is nothing in the specification that describes or illustrates a system in which the base is a part of the roof.

The Court is not persuaded by EcoFasten's response at the hearing. Simply put, the entire patent describes a system to mount a solar panel to a roof. Nowhere in the patent is the base of

---

[4] As the transcript is unavailable from the Claim Construction Hearing, the Court relies on its notes and recollection of the hearing for purposes of drafting this Order.

the mounting system a subpart or component of the roof. In all descriptions and figures, the base is a separate component attached to the roof through an anchor of some kind. The claim describes the attachment as "the base [being] coupled to the roof." The patent simply does not contemplate the base as a subpart of the roof. The Court generally cannot construe two identical terms in the patent to have two different definitions. *See Fin Control Systems Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001) ("[W]e begin with the presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims.").[5] Here, neither party argues the patent allows for the term "coupled to" to be construed in two different manners. Additionally, the Court cannot find any part of the patent that makes it clear that the term "couple to" is intended to have a different meaning in each use. Thus, since the term "coupled to" in the first instance must denote separate pieces directly or indirectly connected to each other, then that same definition carries over to "a block coupled to a base."

Accordingly, the Court construes the term "a block coupled to the base" as requiring the block be separate and apart from the base.

       *ii.*  *The block need not generally have the shape of a rectangular prism or cube.*

EcoFasten seeks to construe the term block as "generally having the shape of a rectangular prism or cube." (ECF No. 38 at 9.) SolarHooks asserts EcoFasten's claim construction of block is too narrow. (ECF No. 39 at 17.) In so arguing, SolarHooks cites to claim 27 of the '044 patent which claims "[t]he mount assembly in claim 22, wherein the block has a trapezoidal shape." (ECF No. 39 at 18.) SolarHooks contends EcoFasten's claim construction would render dependent claim 27 non-sensical because a trapezoid is neither a rectangular prism nor a cube. (ECF No. 39 at 18–19.)

In reply, EcoFasten concedes that "strictly speaking, a rectangular prism is not trapezoidal

---

[5] The parties agree that the prosecution history provides no clues as to the construction of the terms at issue. Thus, the Court will not discuss the prosecution history of the patents.

shaped." (ECF No. 42 at 8 (internal quotation omitted).) However, EcoFasten reasons the term should read "*generally* having the shape of a rectangular prism or cube." (ECF No. 42 at 8.) EcoFasten would describe a trapezoid as a rectangle with sloped sides, and thus, a trapezoidal block would *generally* have the shape of a rectangular prism or cube. (ECF No. 42 at 8.) EcoFasten contends SolarHooks' argument is overly technical and ignores the point of the patent to exclude exotic shapes like spheres. (ECF No. 42 at 9.) EcoFasten contends the term polyhedron would be best, but that a jury is unlikely to know what a polyhedron is. (ECF No. 42 at 9.)

At the claim construction hearing, the Court clarified EcoFasten's argument and asked whether it was even necessary to construe the term block as SolarHooks did not take exception with the term or request a definition beyond the plain and ordinary meaning of block. EcoFasten made no argument against leaving the term as is and reiterated in its closing discussion of this term that the crux of the parties' fight is whether the block must be separate from the base not the construction of "block."

A narrow construction of "block" would render dependent claim 27 illogical and is contrary to the principles of claim construction. *See Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2017 WL 252045, at * 25 (N.D. Cal. Jan. 21, 2014) ("In this way, Samsung makes the same mistake . . . it seeks to impose a requirement in an independent claim that directly conflicts with the plain meaning of a dependent claim.") (citing 35 U.S.C. § 112(d)); *see also Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) (counseling "against interpreting a claim term in a way that excludes disclosed embodiments"). Considering the parties' concession that "block" is not really at issue, the Court finds that the term block need not be construed so narrowly and adopts its plain and ordinary meaning.

### B. "Countersink Extending Around the Opening"

The term "countersink extending around the opening" appears in claims 22, 23, 24, 25, and 30 of the '044 patent.[6]

---

[6] EcoFasten lists only claims 22, 25, and 30 in its opening brief. (ECF No. 38 at 11 n.7.) However, both the joint statement and SolarHook's opposition list claims 22, 23, 24, 25, and 30. (*See* ECF No. 37 at 4; ECF No. 39 at 20.) The Court cannot determine why EcoFasten does not include claims 23 and 24 except perhaps it made an error

9

| EcoFasten's proposed construction | SolarHooks' proposed construction | The Court's Construction |
|---|---|---|
| "a depression surrounding the opening" | "a conical or funnel-shaped depression surrounding the opening" | "a conical or funnel-shaped depression surrounding the opening" |

Independent claim 22 uses "countersink extending around the opening" in the following way:

> A mount assembly mounting a structure to a roof, the roof including a top surface . . . a bracket including a first portion and a second portion, the first portion having an opening aligned with the aperture and a countersink extending around the opening, the second portion extending away from the flashing, the second portion including a slot configured to be coupled to the structure

('044 patent at 46:58–47:3.)

EcoFasten seeks to construe the term to mean "a depression surrounding the opening." (ECF No. 38 at 11.) EcoFasten argues the purpose of the countersink is to create a seal and a seal can be done in a variety of ways. (ECF No. 38 at 11.) EcoFasten further asserts the dictionary definition of countersunk supports its interpretation of the claim term. (ECF No. 38 at 12.) Simply put, EcoFasten contends the definition does not require a conical or funnel shape. (ECF No. 38 at 12.)

SolarHooks asserts the proper construction of a term starts with the specific words of the claim. (ECF No. 29 at 20.) SolarHooks contends that since EcoFasten uses the term "countersink" specifically in claims 22–25 and 30 of the '044 Patent, the proper scope of said claims is limited to depressions that are countersinks. (ECF No. 39. at 21.) SolarHooks argues that EcoFasten wants to impermissibly broaden the construction of the term. (ECF No. 39 at 21.) For its part, SolarHooks defines the term "countersink" as a "conical or funnel-shaped depression." (ECF No. 39 at 21.) In reaching this conclusion, SolarHooks asserts "countersink" is used four times in the patent specification and each use describes a conical or funnel-shaped hole and each use is used alongside the term frustoconical.[7] (ECF No. 39 at 21.) Because

---

in its opening brief.

[7] The parties agree in their joint claim construction statement that the term frustoconical refers to "a shape of a cone without the narrowest part of a cone (the cone may instead have a rounded, flat, nearly flat, or other upper portion instead)." (ECF No. 37 at 2.)

10

frustoconical has a conical shape with the narrowest portion removed or altered, SolarHooks reasons the countersink opening must necessarily be conical or funnel-shaped to accommodate the frustoconical protrusion and make a seal. (ECF No. 39 at 21.) SolarHooks presents patent figures to support its view arguing the specifications and figures confirm the patent does not redefine "countersink" to mean something other than its "customary and ordinary meaning — a conical or funnel-shaped depression." (ECF No. 39 at 22.)

SolarHooks argues that the customary and ordinary meaning is supported by extrinsic evidence and invites the Court to turn to extrinsic evidence to aid in construction of the term. (ECF No. 39 at 22–23.) In support, SolarHooks presents multiple dictionary definitions of "countersink" and a definition of "counterbore" to illustrate its point that the customary and ordinary meaning of countersink is a conical or funnel-shaped depression. (ECF No. 39 at 23.) The definitions for "countersink" generally describe a conical shaped whole with the tip removed whereas the definition for "counterbore" describes a depression with straight or helical flutes. (ECF No. 39 at 23.) SolarHooks uses the distinction of the two terms to argue one ordinarily skilled in the art would recognize countersink as referring to a conical or funnel-shaped depression. (ECF No. 39 at 24.)

In reply, EcoFasten expresses its view that the disagreement between the parties depends on which definition presented is most consistent with the patent. However, EcoFasten argues the Court should focus on the intrinsic evidence in the patent because different definitions of countersink leave the term open to interpretation.[8] (ECF No. 42 at 10.) EcoFasten relies on figures 13 and 13A to demonstrate that the term "countersink" includes depressions that are not conical or funnel-shaped. (ECF No. 42 at 11.)

The Court questioned the parties on the significance of figures 13 and 13A at the claim construction hearing. SolarHooks contended that countersink is a specific term that is understood by those ordinarily skilled in the art to define a specific shape. SolarHooks reiterated its

---

[8] EcoFasten submitted, in support of its reply brief, multiple definitions for countersink that EcoFasten did not disclose to SolarHooks at the appropriate deadline. (ECF No. 42, Exs. 1–3.) SolarHooks moved to strike the definitions. (ECF No. 43.) At the claim construction hearing, the Court found EcoFasten failed to follow the Court's scheduling order in exchanging extrinsic evidence. Therefore, the Court struck the definitions in EcoFasten's reply brief and will not consider them.

11

argument that the term "countersink" is used only four times in the specification and all in connection with frustoconical. SolarHooks asserted broad disclosures like figures 13 and 13A are narrowed by a narrow claim. In support of this contention, SolarHooks cited *General Electric v. ITC*, 682 F.3d 1034, 1041 (Fed. Cir. 2012), for the proposition that when there is a broad specification but a narrow claim, the claim governs. The Court then requested EcoFasten momentarily ignore figure 13 and look solely at the four references of countersink. In viewing those terms, the Court asked EcoFasten the significance of the references. EcoFasten stated "countersink" does not have so narrow a specification in the patent and again argued the definition of countersunk is instructive.

The Court must first look to the intrinsic evidence of the patent before reviewing the definitions and extrinsic evidence. According to the '044 patent, figures 13 and 13A describe an alternate bracket that can be coupled to the seal and flashing. (the '044 patent at 11:45–46.) Figures 13 and 13A from the '044 patent are as follows:



The relevant description in the specification for figure 13 states:

> bracket 20 defines an aperture 64 that includes a first aperture portion 64a and a second aperture portion 64b. The first aperture portion 64a has a substantially cylindrical shape and defines first diameter d5. The second aperture portion 64b has a substantially cylindrical shape and defines a second aperture d6 that is less than the first diameter d5

///

(the '044 patent at 11:34–40.) The relevant description of figure 13A is as follows:

> The bracket 20A differs from the bracket 20 in that the second flange 60A includes aperture 66. The aperture 66 includes a first aperture portion 66a and a second aperture portion 66b. The first aperture portion 66a has a substantially constant diameter da. The second aperture portion 66b has a variable, tapering diameter starting at diameter db, which is less than da and tapering inward to diameter dc . . . . The second aperture portion 66b has a substantially constant slope at which the diameter changes between db and dc. In some embodiments the aperture 66 is tapered along the entire distance between da and dc.

(the '044 patent at 11:45–57.) Neither party argues that aperture portions 64 and 66 do not define depressions used to make a seal. There also seems to be no dispute that aperture portion 64 is not a conical shape and that aperture portion 66 is a conical shape. The disagreement arises because the use of the term "countersink" is not used to described figure 13 and the use of "countersink" elsewhere coincides with the term frustoconical.

EcoFasten points to only one embodiment — figure 13 — in the specification to justify defining "countersink" as a depression rather than as a conical shape with the top removed. (ECF No. 42 at 11.) In contrast, SolarHooks points out multiple uses of the term countersink in the patent are made in connection with frustoconical. (ECF No. 39 at 21–22.) In the first instance, the specification describes an illustrated embodiment that includes "a countersink hole 4154 to accommodate the frustonical protrusion 4124." (the '044 patent at 42:2–6.) In the second and third instances, the patent describes figures including "a countersink (not shown) that compresses the seal 5940 against the frustoconical protrusion 5924." (the '044 patent at 44:56–63.) The parties have agreed that the term frustoconical is defined as "a shape of a cone without the narrowest part of a cone (the cone may instead have a rounded, flat, nearly flat, or other upper portion instead)." (ECF No. 37 at 2.) Thus, "countersink" used in connection with a frustoconical protrusion demonstrates the intent to define countersink as a depression to fit the frustoconical protrusion and as EcoFasten argues, create a seal. While EcoFasten is correct that there are many ways to make a seal, the patent here describes a specific means of creating a seal. Namely, the '044 patent contemplates a seal where a frustoconical protrusion fits securely within a conical or funnel-shaped depression. Thus, the intrinsic evidence supports SolarHooks'

proposed construction of the term.

Additionally, the extrinsic evidence supports SolarHooks' proposed term construction. The extrinsic evidence presents a consistent definition of countersink across sources. The ASM Materials Engineering Dictionary defines countersink as a hole with a "concentric surface at an angle of less than 90 degrees with the center line of the hole." (ECF No. 39-5; Ex. E at 6.) Having the concentric surface — i.e. the surface of the edge of the hole — at an angle less than 90 degrees means the sides taper inward towards the bottom center of the hole. Similarly, the non-technical dictionaries define countersink as: (1) a drill bit for making a "*funnel-shaped enlargement*;" (2) the "*conical enlargement* of the upper part of a hole receiving the head of a screw or bolt;" and (3) "a *conical hole* cut into a manufactured object." (ECF No. 39 at 24–25 (emphasis added).) Finally, SolarHooks presents the definition of "counterbore" as a hole "usually having straight or helical flutes for the passage." (ECF No. 39-5; Ex. E at 5.) Thus, those ordinarily skilled in the art would recognize a distinction between counterbore and countersink. Figure 13A above depicts a countersink, Figure 13 depicts a counterbore as understood in the industry. As such, Figure 13 describes a broader invention than the patent claim. "[C]ase law generally counsels against interpreting a claim term in a way that excludes the preferred embodiment from the scope of the invention." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008). Specifically, the Federal Circuit "has cautioned against interpreting a claim term in a way that excludes disclosed embodiments, when the term has multiple ordinary meanings consistent with the intrinsic record." *Id.*; s*ee, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (noting the disputed claim term has multiple ordinary meanings and adopting the ordinary meaning that includes the disclosed examples in the specification). However, the instant case is distinguishable from the general case for two reasons. First, the term countersink is not used to describe figure 13. Second, the use of countersink in the patent coincides with the term frustoconical. Accordingly, in this instance, the term used in the claim defines a narrower invention and figure 13 may be disregarded. *See General Electric v. ITC*, 682 F.3d 1034, 1041 (Fed. Cir. 2012) (holding when there is a broad specification but a narrow claim, the claim governs).

14

EcoFasten attempts to argue that the Court should review the definition of "countersunk" as it is not as narrowly defined. However, the term "countersunk" does not appear anywhere in the patent. Nor are the definitions presented by SolarHooks varying in such a way that the Court need look to define "countersink" through interpreting its transitive verb, countersunk. Even if the Court were inclined to consider the term countersunk, SolarHooks offers an alternative definition for "countersunk head" as a "head with bearing surface conically shaped." (ECF No. 39 at 23.) Thus, one definition of the term "countersunk" offers support for SolarHooks construction. The definitions presented by SolarHooks and the use of the term in the patent with frustoconical support SolarHooks' proposed construction and demonstrate its construction "most naturally aligns with the patent's description of the invention." *Phillips*, 415 F.3d at 1316.

Accordingly, the term "countersink" is construed as "a conical or funnel-shaped depression surrounding the opening."

### C. "Partially Surround"

The term "partially surround" appears in claims 1, 4, 5, and 6 of the '853 patent.

| EcoFasten's proposed construction | SolarHooks' proposed construction | The Court's Construction |
|---|---|---|
| Plain and Ordinary meaning | Indefinite | Indefinite |

Independent claim 1 uses partially surround in the following manner:

> A roof mounting system, comprising: a flashing defining a first projection and second projection, wherein the second projection is defined within the first projection, and wherein a first aperture is defined through the second projection; a bracket positionable on the flashing and configured to contact the first projection and at least partially surround the second projection

(the '853 patent at 32:47–56.)

EcoFasten did not present argument in its opening claim construction brief on the term "partially surround." (*See generally* ECF No. 38.) However, in its reply brief, EcoFasten contends that indefiniteness is a question for summary judgment not claim construction. (ECF No. 42 at 4.) In the alternative, EcoFasten seeks to give "partially surround" its plain and ordinary meaning. EcoFasten contends that using a term of degree such as partially does not

15

automatically make the claim indefinite. (ECF No. 42 at 4.) Instead, EcoFasten argues the term can be rendered definite when the patent gives some standard of measuring the degree. (ECF No. 42 at 4.) EcoFasten asserts the '853 patent provides sufficient guidance on what the term partially means. (ECF No. 42 at 5.) In so arguing, EcoFasten points to figures 40, 41, and 42, as indicators that partially surround is defined by a notch or slit. (ECF No. 42 at 5.) EcoFasten concludes from these figures that one skilled in the art would know how a notch or slit is measured, and thus, what "partially surround" means in the context of the patent. (ECF No. 42 at 6.)

SolarHooks contends the term is indefinite because the patent does not provide a means of determining to what degree the aperture is "partially" surrounded. (ECF No. 39 at 28.) SolarHooks explains the term "partially surround" is not used anywhere in the patent other than the claims. (ECF No. 39 at 28.) SolarHooks argues that only two sets of figures illustrate the claims at issue: Figures 35–42 and Figures 50–51. (ECF No. 39 at 29.) SolarHooks contends neither set of figures is instructive on the degree of partiality because they both depict a bracket completely surrounding a second projection. (ECF No. 39 at 29.) In support of this argument, SolarHooks cites the description for each figure found in the specification. (ECF No. 39 at 29.) SolarHooks asserts those with ordinary skill in the art are left to guess how little the bracket must surround the second projection because the embodiments for figures 35–42 and figures 50–51 do not show a bracket partially surrounding the second projection. (ECF No. 39 at 31.)

At the claim construction hearing, the Court found indefiniteness was a matter for claim construction citing *Noah Systems, Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012) in support. The Court concluded the term was ripe for construction and elicited additional information regarding the term from the parties. The Court directed SolarHooks to look at the description of Figures 40–42 as provided in the specification and asked whether the terms "notch" and "slit" were sufficient to measure the degree of partially surround. SolarHooks asserted the issue was one of degree, even if the notch constitutes an example of "partially surround," that a single example is insufficient to demonstrate where the bracket goes from not surrounding to partially surrounding. In contrast, EcoFasten explained the embodiments and descriptions

16

allowed one skilled in the art to determine degree because even if the second projection is completely surrounded by the inner portion of the bracket, the outer part of the bracket would still only partially surround the second projection.

Figures 35–42 depict alternative flashings and brackets. (the '853 patent at 13:51, 14:55–56.) The flashing from figure 39 is described as follows:

> The third flashing 216 also includes a second upwardly extending projection 276 extending out of the first plane around a majority of the circumference of the first projection 230. The second upwardly extending projection 276 has a substantially curved shape and forms almost a complete ring around the first projection 230.

(the '853 patent at 14:9–14.) It is important to note the specification interchanges the terms first projection and second projection as compared to the claim language. In claim 1, "the second projection is defined within the first projection." (the '853 patent at 32:50–51.) In the specification, the "second upwardly extending projection" forms almost a complete ring around the first projection. The claim explains the second projection is found inside the first projection. Therefore, the reference to "second upwardly extending projection" denotes the "first projection" in the claims at issue and the "first projection 230" is the "second projection" from the claim language.[9]

The bracket from figures 40–42 is best viewed in figure 42 below.



FIG. 42

///

---

[9] For ease of reference, the Court will change the embodiment to label the figures as they are called in the claim. These changes will be denoted in brackets.

The specification describes how the bracket in figure 42 would interact with the flashing from figures 35–39.

> The first aperture portion 268a is sized to receive the [first] projection 276. The downwardly protruding annular flange 282 is substantially planar with the distal surface of the second flange 260 of the bracket 220. The [first] projection 276 and the downwardly protruding annual flange 282 substantially mate, such that the downwardly protruding annual flange 282 contacts the flashing 216 between the [second] projection 230 and the [first] projection 276.

(the '853 patent at 15:19–27.) In other words, the downward angled ring inside the bracket is designed to touch the flashing between the projections. When touching the flashing, the downward angled ring would completely surround the second projection and then itself be surrounded to some degree by the first projection.

This presents an issue as the notch or slit in the outer portion of the bracket is then outside the first projection and not around the second projection as the claim requires. EcoFasten attempted to rectify this issue at the hearing by explaining that the outer portion of the bracket still partially surrounds the second projection even though the second projection is also completely surrounded by another section on the inside of the bracket. The Court fails to see how this explanation matches the claim language. The claim language specifically allows for a bracket "configured to contact the first projection and at least partially surround the second projection." (the '853 patent at 32:54–56.) The claims do not allow the bracket to also partially surround the first projection. Without figures 35–42 and 50–51, the patent offers no details as to the degree of "partially surround." Thus, the claim term is insufficiently defined to offer one ordinarily skilled in the art a means by which to calculate "partially surround." The Court finds the term "partially surround" is indefinite as used in the '853 patent.

### IV. CONCLUSION

For the reasons stated above, the Court construes the terms as follows:

1. "A block coupled to the base" is construed as "a standoff separate from the base connected or fastened to the base";
2. "A countersink extending around the opening" is construed as "a conical or funnel-shaped depression surrounding the opening";

3. "Partially surround" is determined to be indefinite.

IT IS SO ORDERED.

Dated: September 10, 2018

Troy L. Nunley
United States District Judge